**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARION THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  21 C 06061 |
| | ) | |
| DANIEL MCAULIFFE, MICHAEL BOTICA, | ) | Judge Rebecca R. Pallmeyer |
| CITY OF CHICAGO, and UNIDENTIFIED | ) | |
| OFFICERS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Marion Thomas alleges that Defendant police officers Daniel McAuliffe and Michael Botica violated his constitutional rights during a traffic stop in November 2019.  At the conclusion of a five-day trial in February 2024, the jury returned a verdict in favor of Defendants.  Thomas has moved for a new trial or, in the alternative, to set aside the judgment on account of fraud, misrepresentation, or misconduct by the Defendants.  For the reasons explained below, the motion is denied.

**BACKGROUND**

Marion Thomas brought suit in this case under 42 U.S.C. § 1983, claiming that he suffered constitutional violations in the form of an unlawful search, unlawful seizure, false arrest, and use of excessive force at the hands of Chicago police officers Daniel McAuliffe, Michael Botica, Nicholas Morales, and Juan J. Sanchez during a vehicle stop on November 19, 2019. (*See* First Am. Compl. [44] ¶¶ 15–35).  Thomas also leveled a state law malicious prosecution claim against Botica and McAuliffe for having charged him with failure to use his turn signal and possession of marijuana—charges that were terminated in Thomas's favor on December 24, 2020.[1]  (*Id.* ¶¶ 36,

---

[1]      At the time of Thomas's arrest, it was a violation of Illinois law to knowingly possess cannabis.  (Jury Instructions [102] at 24.)  The Illinois Cannabis Regulation and Taxation Act, 410 ILCS 705, *et seq*, which legalized the recreational possession and use of marijuana, was signed

38.)  Thomas also named the City of Chicago ("the City") as a Defendant, seeking indemnification for damages caused by the officers.  (*Id.* at ¶¶ 40–45.)

All Defendants moved for summary judgment on May 12, 2023.  ([52].)  Although the court dismissed many of the claims in the suit (including all claims against Morales and Sanchez), genuine issues of material fact precluded summary judgment on Thomas's claims against Officers Botica and McAuliffe for unlawful seizure, unlawful search, and false arrest, and against the City for indemnification.  (*See* Order [71]).  At a February 2024 trial on those claims, the court granted McAuliffe and Botica's motion for a directed verdict with respect to the unlawful search claim, and the jury returned a verdict in favor of the Defendants on the unlawful seizure and false arrest claims. ([98, 100].)  In his post-trial motion, Thomas challenges the court's evidentiary rulings and jury instructions and argues that the defense knowingly introduced false testimony of Officer Morales at trial.  (*See* Mot. [114] at 2.)

I.     **Defendants' Account of Thomas's Stop and Arrest**

In assessing Thomas's motion for a new trial, the court reviews the evidence presented at trial "in the light most favorable to the jury's verdict."  *Burzlaff v. Thoroughbred Motorsports, Inc.*, 758 F.3d 841, 843 (7th Cir. 2014).

On November 19, 2019, Officers Botica and McAuliffe were travelling eastbound on 83rd Street on the southwest side of Chicago in an unmarked squad car.  (Tr. at 23:9–14, 27:4–7, 28:5–6.)  When they observed a vehicle in front of them turning left without activating its turn signal, McAuliffe activated the emergency lights on the squad car and "chirped" the siren briefly; Thomas, who was driving the car in front of the officers, immediately pulled over, and the officers pulled over and parked slightly behind Thomas's car.  (*Id.* at 29:22–30:7, 31:16–19, 32:1–4.)  Botica and McAuliffe exited the squad car, and approached Thomas's vehicle, Botica on the passenger side and McAuliffe on the driver's side.  (*Id.* at 32:13–20.)  Both Botica and McAuliffe

---

into law on June 25, 2019, but was written to become effective only on January 1, 2020.  *See* 410 ILCS 705/10-5.

detected the smell of marijuana when they first approached the vehicle. (*Id.* at 99:3–7, 223:11–12.)

When McAuliffe approached Thomas's car from the driver's side, Thomas rolled down his driver's side window, but only "about two inches," as McAuliffe testified. (*Id.* at 32:23–24; *see also* McAuliffe Body Worn Camera ("BWC") Footage [126-1] at 2:10–2:15 (confirming that Thomas's driver's side window was rolled down no more than a few inches when McAuliffe approached the car).) Thomas passed his insurance and driver's license through the small opening in the window. (*Id.* at 32:25–33:2.) McAuliffe recalled that he could not clearly see Thomas's movements inside the vehicle, as the windows were tinted, and Thomas had rolled the window down by just a "crack" (*id.* at 113:21–23); McAuliffe also testified, however, that he could see that Thomas had left the gearshift in drive. (*Id.* at 37:22–24; *see also* McAuliffe BWC Footage at 3:13–3:22.) Soon after Botica and McAuliffe had stopped Thomas, Officers Morales, Jauregui, and Sanchez, who were assigned to patrol with Botica and McAuliffe, arrived on the scene in another unmarked police vehicle. (*Id.* at 35:1–21, 36:8–13; 24:16–24.)

Officer McAuliffe asked Thomas several times to roll down his driver's side window further, but Thomas refused to do so. (Tr. at 114:14–18.) McAuliffe also repeatedly asked Thomas to put his gearshift into park; Thomas did so only after the third request. (*Id.* at 38:2–7, 119:14–19.) Then, as Thomas continued to refuse the officer's request that he roll down his window, McAuliffe asked Thomas—several times--to step out of the vehicle. (*Id.* at 41:15–17.) By McAuliffe's count, he asked Thomas to step out eight times, but Thomas did not comply. (*Id.* at 135:2–3.) Instead, Thomas questioned why he was being asked to step out of the vehicle. (*Id.* at 41:18–42:4.)

Finally, McAuliffe opened the driver's side door and placed his hand on Thomas's shoulder. (*Id.* at 42:5–16.) McAuliffe and Sanchez, who was also on the driver's side of Thomas's vehicle at this point, then attempted to pull Thomas up from his seat and out of the car into a standing position; but, as McAuliffe testified, Thomas "went limp, like dead weight, and fell on his back onto the ground." (*Id.* at 42:7–9, 43:7–16.) As Thomas was being pulled out of the car and

falling onto the ground, he reacted in an extreme way: he began to scream at a high pitch, loudly calling for help, and at one point exclaiming that he was having a seizure or "felt like" he was having a seizure. (Thomas BWC Footage at 6:47–7:05.) Once Thomas was on the ground, McAuliffe and Botica, who had come around from the passenger side of the car, placed Thomas in handcuffs almost immediately. (*Id*. at 45:4–13.) McAuliffe and Botica then walked Thomas back to their unmarked police vehicle and were joined there by Officer Morales. (*Id*. at 52:8–21, 399:12–13.)

While Thomas was being held at McAuliffe and Botica's squad car, Officers Jauregui and Sanchez searched Thomas's car, but did not find marijuana. (*Id*. at 399:3–9, 399:25–400:3.) Officer Morales searched Thomas's car at the scene shortly afterwards, however, and discovered in the armrest pocket of the driver's side door "a half-used joint of marijuana"— referred to as "a roach"— as well as a small white lighter. (*Id*. at 400:3–18; *see also* Morales BWC Footage [126-4] at 18:00–18:20.) Prior to the discovery of the roach, Thomas had speculated—not compellingly, in McAuliffe's view—about possible sources of the odor other than actual marijuana, suggesting that he might have "sprayed hemp cologne or had a hemp lunch". (*Id*. at 122:13–25; *see also* McAuliffe BWC at 13:30–13:45.) When told that Officer Morales had recovered the roach, Thomas—still being held at McAuliffe and Botica's squad car—claimed that the roach belonged to his mother. (*Id*. at 123:17–20; *see also* Botica BWC Footage [126-5] at 19:13–19:35.)

McAuliffe testified that, once Thomas was in the custody of the police officers on scene, one of those officers (evidently not himself or Botica) "called for a transport car" to take Thomas to the police station.[2] (*Id*. at 64:15–18.) A transport car, driven by Officer Melecia Buchanan (not a named Defendant) arrived shortly thereafter. (*Id*. at 543:17–23.) Thomas was placed in the back of the transport car, and Buchanan began driving toward the police station—but she rerouted

---

[2]     As McAuliffe explained, a transport car is a marked police vehicle which, unlike the unmarked squad car McAuliffe and Botica were using, has a divider between the front and back seats. (Tr. at 64:23–65:12.)

4

when Thomas told her he was experiencing a seizure and took him to Holy Cross Hospital.[3]  (*Id.* at 551:3–12.)  Soon afterwards, Officers Botica and McAuliffe drove to the hospital, where they issued a ticket for Thomas's failure to use his turn signal, as well as a civil citation for possession of marijuana.  (*Id.* at 66:16–21; 88:22–25, 90:8–14.)

## II.     Trial Testimony of Officer Morales

Thomas's motion concerns, in part, the trial testimony of Officer Morales (at that stage, no longer a Defendant) as to what he saw in Thomas's car.  Morales testified that, in addition to the roach and lighter, when he searched Thomas's vehicle he found "a small tray and a marijuana grinder."  (*Id.* at 401:13–15.)  Counsel for Thomas objected to Morales's mention of the tray and the grinder, but when asked, Thomas's counsel did not state grounds for the objection, and the court overruled it.  (*Id.* at 401:16–19.)  Morales went on to explain that a grinder is a small tool "about the size of a hockey puck" used to break down marijuana into small pieces, similar to how a pepper grinder breaks down peppercorns.  (*Id.* at 14:14–17.)  The smaller pieces of marijuana, Morales continued, can then be used to "prepare [a] joint"; the tray is a surface used to prepare a joint while keeping the ground marijuana from "falling off and spilling onto the floor."  (*Id.* at 14:18–20.)

At the conclusion of Morales's direct testimony, Thomas moved for a mistrial on the grounds that Morales's testimony regarding the grinder was "brand new."  (*Id.* at 414:6–13.)  The parties agree that the word "grinder" was not spoken on any of the body worn camera footage of Thomas's stop and arrest, nor was the term used in discovery in this case.  (*Id.* at 670:23–671:3.)  Instead, Morales had testified at his deposition (while reviewing body worn camera footage of the stop and search) that he thought he heard another officer say he had found something called a "cutter" in the car.  (*Id.* at 415:11–416:2; Morales Dep. [126-2] at 71:5–13.)

---

[3]     Thomas was examined in the emergency room at Holy Cross that night by Dr. David Prigge, who testified at trial.  (*See generally* Tr. at 501:1–542:3.)  There was no evidence that Prigge confirmed (or even suspected) that Thomas had in fact suffered a seizure.

The court denied Thomas's oral motion for mistrial. (Tr. at 418:19–20.) Instead, to address Thomas's claim of surprise, the court offered to instruct the jury to disregard any evidence that a "grinder" was found in Thomas's car; Thomas declined that proposal in favor of cross-examining Morales regarding his failure to use the word "grinder" during his deposition. (*See id.* at 428:1–432:4.) Morales's direct testimony had concluded at the end of the trial day; during cross examination the following morning, Morales clarified that he, personally, had not discovered the "cutter" or "grinder," but testified that he believed the two terms to be synonymous. (*Id.* at 411:18–22, 447:4–22; 457:4–10, 458:10–12.) Thomas's counsel spent only a short time exploring this topic (and the distinction, if any, between "cutter" and "grinder") on cross-examination. The relevant exchange is reproduced in full below:

> Q: Okay. A grinder is a – it's a round device with two halves that separate, and it has sharp teeth that align in such a way as to grind something; is that correct?
>
> A: Yeah, that describes the grinder or the cutter.
>
> Q: Okay. Those are different terms, right? They are not synonymous?
>
> A: They are synonymous. Same thing.
>
> Q: Okay. You're saying – a grinder is something like – if you said a bong, that would be just for cannabis use, right?
>
> A: Yeah.
>
> Q: Okay. And a grinder is something like that, just for cannabis use; is that right?
>
> A: Yes.
>
> Q: Okay. And a cutter is – I mean, a cutter could be a cutter in the kitchen, right?
>
> A: I don't know what a cutter in a kitchen is, but I know what a cutter for marijuana is.
>
> Q: It could be a cutter in – a box cutter, is that correct?
>
> A: That can be, yeah.

(*Id.* at 458:6–459:1.)

Although her cross-examination on this issue was brief, counsel for Thomas devoted a

significant amount of time at closing arguments to attacking Morales's testimony and contending that Morales's lack of credibility bolstered Thomas's case for false arrest, given that Morales was also the officer who found the alleged roach in Thomas's car. (*See id.* at 709:3–715:16.) In its charge to the jury, the court reminded the jurors of the parties' stipulation that the word "grinder" was never used in depositions and was not used in the body worn camera footage. (*Id.* at 683:24–684:3.)

## III. Cross-Examination of Thomas

### A. Evidence of Subsequent Arrest

Thomas asserts that defense counsel committed the "highly prejudicial act" of asking Thomas "this is not the only time you were arrested, is it?" (Mot. at 10.) Thomas does not cite to any specific part of the trial transcript to support this assertion, but states that he "believes the transcript will show that Plaintiff's counsel objected, and the court upheld the objection." (*Id.*)

The phrasing was not exactly as Thomas recalls, but the interaction did occur. Defense counsel asked Thomas whether, at the scene of his November 19, 2019 arrest, Thomas had told the officers that he did not have a record, to which Thomas replied "yes." (Tr. at 374:8–10.) Defense counsel then asked: "that's not entirely true, is it?" (*Id.* at 374:11.) Counsel for Thomas objected on the grounds that this question went beyond the scope of Thomas's re-direct testimony, the court sustained the objection, and the topic did not come up again during trial. (*Id.* at 374:12–13.)

### B. Evidence of Other Lawsuit

Thomas also posits that the court "erred in allowing Defendants to introduce evidence of and cross-examine Plaintiff with his deposition transcript regarding a subsequent second lawsuit he filed" against other Chicago police officers. (Mot. at 15.) Again, Thomas fails to provide a transcript citation or describe in any detail the challenged evidence. The other lawsuit, *Franklin v. Zia*, No. 22 C 2886 (N.D. Ill.), was brought by Thomas and his mother, Janalene Franklin, regarding an encounter with Chicago police on June 3, 2020, less than seven months after his

7

interactions with Defendants in this case. From the time of the filing of the complaint in *Franklin* on June 1, 2022 until April 3, 2024, when counsel withdrew, Thomas was represented by the same attorney who represents him in this case. (*See* 22 C 2886 ECF Nos. 102, 111, 118.) *Franklin* was eventually terminated for lack of prosecution. (*Id.* Nos. 133, 136, 137.)

The possibility that Thomas would be questioned regarding *Franklin*, or at least about the incident underlying that case, was first raised in Defendants' January 30, 2024 responses to anticipated motions *in limine* by Thomas. (*See generally* [81] at 1–2.) Defendants pointed out that, in both this case and *Franklin*, Thomas claimed that he "suffer[s] and continue[s] to suffer mental anguish, psychological and emotional distress, pain and suffering, and economic losses, some or all of which may be permanent." (*Id.* at 2.) As such, Defendants reasoned, the jury in this case "could conclude that the other incident is the source of any [injuries] that [Thomas] alleges." (*Id.*)

At pre-trial conference on January 31, 2024, the parties and the court discussed the issue further. (*See* Tr. of Final Pretrial Conf. Proc. [87] (hereinafter "Pretrial Tr.") at 13:1–17:16.) At that time, the court noted that while it is "not unusual at all for a cross-examining attorney to ask whether there were sources of distress other than the ones that are at issue in the lawsuit," there was no reason to focus on the litigation in *Franklin*, as opposed to the other source of distress itself, unless Thomas denied "having pain or suffering from some other source." (*Id.* at 16:22–23, 17:4–6.) The court denied the motion *in limine*. (*Id.* at 17:14–16.)

At trial several weeks later, the defense's cross-examination of Thomas on this issue proceeded substantially along the lines discussed at the pretrial conference. Following a line of questioning regarding Thomas's assertion that he suffered a seizure as a result of the November 19, 2019 incident (*see* Tr. at 336:13–346:1), defense counsel began to probe Thomas about his claimed damages in this case: Thomas testified that he suffered and continues to suffer from emotional distress in the form of anxiety and depression as a result of the November 19, 2019 incident. (*Id.* at 346:2–347:6.)

8

Defense counsel then asked Thomas: "On June 3rd, 2020, you had an interaction with some other police officers after some other department employees called the police. Would you agree?" (*Id.* at 347:14–16.) Thomas's counsel objected to the line of questioning but was overruled, as the court found it proper to allow defense counsel to continue laying foundation about "what other stresses there might have been"; eventually, Thomas confirmed that he had an interaction with police officers on June 3, 2020. (*Id.* at 347:19–348:25.)

Defense counsel then inquired whether Thomas claimed to also have "suffered psychological and emotional distress" because of his June 3, 2020 interaction with the other officers. (*Id.* at 349:14–15.) Confusion ensued when Thomas answered: "It was the same officers that I had interactions with in the past, actually," leading defense counsel to request a sidebar. (*Id.* at 349:16–18.) At sidebar, defense counsel noted that the officers from the two incidents were *not* the same, and posited that Thomas had "opened the door that he filed another lawsuit against other officers for another incident"; the court disagreed, pointing out that Thomas "didn't mention that he filed another lawsuit." (*Id.* at 349:20–24.) Instead, the court instructed, the defense was entitled only to impeach Thomas regarding whether the same officers had been involved in both incidents. (*Id.* at 349:25–350:1.) Soon after defense counsel resumed cross-examination, Thomas testified that he had not meant to say that the same officers were present on November 19, 2019 and June 3, 2020; rather, he meant that he was already familiar with *one* of the officers present on June 3, 2020 because Thomas's mother had "had issues" with that officer in the past. (*Id.* at 350:15–351:2.)

The question of exactly which CPD officers were present on June 3, 2020, re-emerged just a few moments later, when defense counsel confirmed that Thomas had given sworn testimony on September 27, 2023 about the June 3, 2020 incident. (*Id.* at 351:9–15.) Defense counsel then asked: "on September 27th, 2023, you testified under oath that your interaction with those officers on June 3rd, 2020, was the only thing in your life causing you anxiety?" (*Id.* at 351:16–19.) Thomas replied that he did not "remember saying that." (*Id.* at 351:25.)

9

At this point, defense counsel attempted to impeach Thomas using Thomas's deposition testimony from *Franklin v. Zia*, but counsel for Thomas objected. (*Id.* at 352:1–6.) At sidebar, Thomas's counsel explained that she did not have a copy of the document the defense was using for impeachment, and that defense counsel had refused to provide a copy during an earlier break in proceedings because counsel for Thomas hadn't purchased the transcript at the time (recall that counsel for Thomas in this case was also representing him in *Franklin* and had been present at the deposition). (*Id.* at 352:1–8.) The court then ordered a recess to address the parties, ensure the document was tendered, and give counsel for Thomas a chance to review it. (*See id.* at 352:15–353:24.)

During the recess, counsel for Thomas objected to any use of the deposition testimony for impeachment because, in her view, Thomas had been "kind of trick[ed]" into saying his emotional distress stemmed "only from June 4th." (*Id.* at 354:4–354:21.) As the court explained, counsel for Thomas was welcome to rehabilitate Thomas along those lines, but her opinion that her client had been "tricked" into saying something unfavorable in prior testimony was not "a reason to exclude this line of questioning." (*Id.* at 354:22–24.)

Following the break, defense counsel resumed cross-examination and sought to confirm with Thomas that Officers Botica and McAuliffe "were nowhere to be seen" on June 3, 2020—but Thomas responded by saying "No. I don't know. It was a lot of police officers." (*Id.* at 356:17–19.) Defense counsel then proceeded to ask whether Thomas was claiming that Botica and McAuliffe had done "something wrong" to him on June 3, 2020, to which Thomas replied that every officer present on June 3, 2020 had done something wrong to him but that he did not know if Botica and McAuliffe were there specifically. (*Id.* at 356:20–357:1.) Over Thomas's attorney's objection, defense counsel pointed out that Thomas had filed a complaint about the June 3, 2020 incident but failed to name Botica or McAuliffe as Defendants. (*Id.* at 357:2–18.) In the end, Thomas stuck to his story that, although he had not named Botica or McAuliffe as defendants in

the other case, he *had* named Unidentified Officers as defendants, and Botica or McAuliffe "could have been one of the unidentified officers." (*Id.* at 357:22–358:11.)

Following this exchange concerning the presence of Botica or McAuliffe had at both incidents, the defense proceeded with cross-examination on the source of Thomas's emotional distress. Referring to the other lawsuit, counsel asked:

Q: And in that lawsuit, you testified that you had emotional distress and psychological distress. Yes?

A: Yes.

Q: And in that lawsuit, you testified that your interaction with those officers from June 3rd, 2020, was the only thing in your life causing you anxiety?

A: In the year of 2020, yes.

Q: You testified on September 27th, 2023, that your incident from June 3rd, 2020, was the only thing in your life causing you anxiety?

A: In the year of 2020, up further – so 2020, 2021, yes. 2019, [Botica and McAuliffe] caused me anxiety.

Q: Well, the truth is, you also testified that you didn't have any anxiety before June 3rd, 2020; isn't that right?

A: Before? After the accident? After this incident happened, then things started to calm down. That was, what? Six or seven months later. Six or seven months later, I was back able to drive again. So no, I didn't have no anxiety, no depression, no seizures six to seven months after that situation happened. And then six to seven months later, when I'm back clear to drive, I have another situation with Chicago Police Department.

[Defense counsel]: Page 228, Lines 6 through 14 from his deposition on September 27th, 2023.

Q: Now, in this deposition, you're talking about the incident from June 3rd, 2020. Were you asked these questions and did you give these answers:

> Q: And so, is your anxiety and depression that you have now based solely upon this incident?

> A: Yes.

> Q: There is nothing else now that causes you anxiety or depression in your life right now?

> A: Yes.

11

Did I read those questions right?

A: Yes. I said that.

Q: So when you were in another lawsuit suing other officers for a different incident, you claimed all of your injuries were based on their conduct?

A: Yes.

Q: And now that you are in this lawsuit, you're claiming all your injuries are based on these officers?

A: Different times, different injuries, yes.

Q: Well, they're not different times and different injuries. You said that it was psychological and emotional distress in that lawsuit, right?

[Thomas's counsel]: Objection. Argumentative.

THE COURT: Sustained.

[Defense counsel]: No further questions.

(*Id.* at 358:12–360:12.)

During closing arguments, defense counsel mentioned Thomas's other lawsuit only once:

During this lawsuit he said he has had problems ever since November of 2019 as a result of this incident, and he is never going to be the same. Yet you heard him testify that he filed a lawsuit for an incident seven months after ours. And during the deposition in that case he said that he never had any problems before that incident. Powerful motive to testify the way he is.

(*Id.* at 746:9–15.)

## **LEGAL STANDARDS**

Thomas moves for a new trial under Federal Rule of Civil Procedure 59(a) with respect to claimed erroneous jury instructions and admissions of evidence and cross-examination. (Mot. at 2.) Apart from any legal errors on the court's part, Thomas also seeks relief on the theory that Defendants abused the judicial process by knowingly presenting false testimony from Morales. (*See id.* at 12–14.) Thomas asks that the court set aside the verdict pursuant to its "inherent power to impose sanctions," enter judgment for Thomas, conduct a new jury trial on the issues of damages, and award attorneys' fees and costs. (*Id.* at 13–14.) Failing that, Thomas asks the

court to grant a new trial pursuant to the same power or else under Rule 60(b)(3), on account of Defendants' fraud or misrepresentation. (*Id.* at 13–14.) [4]

## I.    Rule 59(a) Motion for New Trial

As a general matter, courts may order a new trial under Rule 59(a) only if "the jury's verdict is against the manifest weight of the evidence, . . . or if for other reasons the trial was not fair to the moving party." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012).  A district court's denial of a motion for new trial under Rule 59(a) is reviewed for abuse of discretion.  *Equal Emp. Opportunity Comm'n v. Wal-Mart Stores, Inc.*, 38 F.4th 651, 659 (7th Cir. 2022).  Such a motion must be filed no later than 28 days after the entry of judgment.  FED. R. CIV. P. 59(b).

A new trial on account of an erroneous ruling by the court is warranted only where the error has had a "substantial influence over the jury, and the result reached was inconsistent with substantial justice."  *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016); *see also* FED. R. CIV. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order.  At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.")[5]  Errors that are harmless in isolation may, in the aggregate, become prejudicial where "the multiple errors so infected the jury's deliberation that they denied the party a fundamentally fair trial."  *Sanchez v. City of Chicago*, 880 F.3d 349, 361 (7th Cir. 2018). Evidentiary rulings admitting disputed evidence are reviewed for abuse of discretion.  *Doornbos*

---

[4]    Thomas also claims to be seeking relief under Federal Rule of Civil Procedure 37 but fails to explain how Rule 37 would apply here.  (*See* Mot. at 12.)  Officer Morales was disclosed as a witness and made available for depositions.

[5]    Note that the harmless error analysis under Rule 61 is for civil cases only.  The harmless error standard in criminal cases is "significantly more stringent," requiring that a rendered guilty verdict "was surely unattributable to the error."  *United States v. Ross*, 77 F.3d 1525, 1540 (7th Cir. 1996).

*v. City of Chicago*, 868 F.3d 572, 579 (7th Cir. 2017). Errors in the admission of evidence require a new trial "only when a significant chance exists that they affected the outcome of the trial." *Hall*, 840 F.3d at 926.

A district court's jury instructions are reviewed with deference and are analyzed "as a whole to determine if they accurately state the law and do not confuse the jury"; the district judge is not obligated to "describe all valid legal principles" in her instructions. *Carter v. City of Wauwatosa*, 114 F.4th 866, 880 (7th Cir. 2024). The court's decision whether to give a particular jury instruction is reviewed for abuse of discretion. *Doornbos*, 868 F.3d at 580. Finally, even if an instruction is legally deficient, a new trial is required only if the confusing or misleading nature of the instruction prejudiced the complaining party; "the risk that an incorrect jury instruction prejudiced a party depends at least in part on how closely balanced the evidence was at trial." *Id.*

## II.      Rule 60(b)(3)

"To obtain relief under Rule 60(b)(3), a party must show that she has a meritorious claim that she was prevented from fully and fairly presenting at trial as a result of the adverse party's fraud, misrepresentation, or misconduct." *Wickens v. Shell Oil Co.*, 620 F.3d 747, 758–59 (7th Cir. 2010) (citing FED. R. CIV. P. 60(b)(3)). Such fraud must be proved "by clear and convincing evidence." *Wickens*, 620 F.3d at 747. "It is well-established that Rule 60(b) relief is an extraordinary remedy and is granted only in exceptional circumstances." *Id.*

## III.     Court's Inherent Powers to Impose Sanctions

A district court may impose sanctions under its inherent authority "where a party has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Fuery v. City of Chicago*, 900 F.3d 450, 463 (7th Cir. 2018). This authority is broad and allows courts to enter judgment against the offending party, where warranted. *Id.* The imposition of sanctions pursuant to this inherent authority is reviewed for abuse of discretion. *REXA, Inc. v. Chester*, 42 F.4th 652, 671 (7th Cir. 2022).

14

<u>**DISCUSSION**</u>

**I.      Rule 59(a) Motion for New Trial**

Defendants oppose the Rule 59 motion for new trial both on the merits and on timeliness grounds.  As explained here, the court concludes that the motion was timely but denies it on the merits.

**A.  Timeliness**

Under Federal Rule of Civil Procedure 58, with a few exceptions, "a judgment is not effective until it is set forth on a separate document and entered on the district court civil docket." *Am. Nat. Bank & Tr. Co. of Chicago v. Sec'y of Hous. & Urb. Dev. of Washington, D.C.*, 946 F.2d 1286, 1288 (7th Cir. 1991).  The judgment must be "self-contained and complete," must "set forth the relief to which the prevailing party is entitled," and "should not incorporate another document or contain legal reasoning." *Id.* at 1289.  Further, the entry of judgment should "inform[] the parties and the appellate court exactly what has been decided." *Paganis v. Blonstein*, 3. F.3d 1067, 1069 (7th Cir. 1993).

In this case, Thomas argues that judgment in the case was not entered until March 22, 2024 (nearly a month after the jury verdict), the date on which the court entered a completed Form 450 in the docket.  (Mot. at 1.)  Thomas contends this form is the only existing "separate document" setting out the judgment as required by Rule 58.  (*Id.*; Reply [133] at 1.)  Defendants argue that judgment was entered either on February 23, 2024, when the jury read its verdict in front of Thomas and his counsel; on February 26, the date of the court's minute entry announcing the jury verdict ([101]); or February 28, 2024, the date that the court issued an unnumbered docket entry providing notice of judgment.  (Opp. [126] at 6.)

Thomas surely was aware that he had lost his case when the jury returned its verdict, but the court concludes he is correct on this issue:  The court neglected to file the Judgment form, and Rule 58 was not satisfied until March 22, 2024.  Form 450 is "the preferred and sound vehicle" for entering judgment (*Hope v. United States*, 43 F.3d 1140, 1142 (7th Cir. 1994)), though the

form is not strictly required to enter judgment under the Seventh Circuit's interpretation of Rule 58, which allows that "a district court's docket entry" can satisfy the requirements of Rule 58. *Brown v. Fifth Third Bank*, 730 F.3d 698, 700 (7th Cir. 2013). The trouble is that, by mistake or oversight, no such minute order was produced in this case.

At first blush, the unnumbered docket entry of February 28, 2024 might appear to be a document that satisfies Rule 58: it is self-contained, does not incorporate another document or reasoning, and makes clear that the civil case was terminated. But the entry does not actually say who won the case. And the docket entry is not actually a minute order: rather, it seems to represent the notice of judgment that the Clerk of Court is required to serve on the parties under Federal Rule of Civil Procedure 77(d). The Seventh Circuit does "not allow a Rule 77(d) notification to do service for a Rule 58 judgment." *Brown*, 730 F.3d at 701. The minute entries of February 26 and February 28, 2024 will not suffice for Rule 58 purposes either because they reflect only the jury's verdict and not the judgment of the court. The fact that the court read this jury's verdict aloud in court on February 23 is of no consequence because a jury verdict is not the same thing as a judgment and there was no "separate document" entered in the docket on that date.[6]

As Thomas points out (*see* Reply at 2), the purpose of Rule 58 is not only to announce winners and losers but also to make clear "exactly what has been decided and when," because entry of a final judgment "starts the clock for an appeal." *Brown*, 730 F.3d at 700. Given the context in this case, it seems highly likely that Thomas understood the case had been decided against him in the district court by February 28, 2024; nonetheless, the court's oversight produced a situation where it was not absolutely clear that Thomas's clock for appeal had started to run. That only happened on March 22, 2024, when the court finally entered a copy of Form 450.

---

[6]     *Aponte v. City of Chicago*, cited by Defendant here, is not controlling and makes no mention of Rule 58 at all. No. 09 C 8082, 2012 WL 1533309, at *1, 3 (N.D. Ill. Apr. 26, 2012).

Thomas's Rule 59 motion for a new trial, filed on April 19, 2024, the 28th day after March 22, was timely.

### B. Testimony of Morales

Thomas now renews his prior oral motion for mistrial on account of Morales's testimony that he saw a "grinder" in Thomas's car at the time of Thomas's arrest, arguing that the court's decision to allow the testimony had a substantial and injurious effect on the jury's verdict. (Mot. at 11.) Thomas insists that the claimed evidentiary error requires a new trial because evidence that a "grinder" was found inside of Thomas's car was "material . . . as it went to the very core of the issue whether the vehicle smelled of cannabis when the Defendants and other officers approached." (*Id.* at 12*.*)

To the extent that Thomas takes issue with the court's overruling his initial objection to Morales's testimony, Thomas failed to preserve this argument for post-trial review, as Defendants point out. (*See* Opp. at 23–26.) To preserve an evidentiary issue for review, a party must make a timely objection at trial that is "specific enough to give the opposing party and the trial judge notice of the basis unless the basis for the objection is apparent from the context." *United States v. Echols*, 104 F.4th 1023, 1028 (7th Cir. 2024). This rule "is designed to enable parties to dispute evidentiary issues in the context in which they arise, and to give the trial judge—who has the benefit of observing the presentation of evidence firsthand and in real time—the opportunity to make a well-informed ruling." *Id.* Thomas's attorney objected at trial when Morales mentioned a grinder, but when asked to state the grounds or rationale for the objection, remained silent. That a witness testifies inconsistently with his deposition or with other evidence is not by itself grounds for an objection, and Thomas cannot now fault the court for overruling an objection that his counsel could not justify at the time it was raised.

Even if the court did err in overruling Thomas's vague objection at the time, Thomas was not left without a remedy. The court specifically offered to instruct the jury to disregard any evidence that a "grinder" was found in Thomas's car, but Thomas rejected that offer in favor of

cross-examining Morales about the inconsistent testimony. This was a reasonable strategic decision: Thomas used the inconsistency as ammunition for a lengthy assault on Morales's credibility during closing argument. The court also reiterated to the jury before deliberations that the parties had stipulated that the term "grinder" was not used at the time of Thomas's arrest or later in depositions in this case.

Finally, Thomas's purported possession of a "grinder" or "cutter" in his car likely had little effective on the jury's verdict. First, even if the jury did not believe that the officers had smelled marijuana or seen any evidence of marijuana possession or use in Thomas's car, there was ample evidence from which they could conclude that the officers had probable cause to arrest Thomas for "resisting" or "obstructing." Further, leaving aside any difference between a "grinder" and a "cutter," and even whether such a tool was discovered in Thomas's car at all, the jury heard and saw evidence that a partially smoked marijuana cigarette (a "roach") and a tray used for rolling marijuana cigarettes were found in Thomas's car. Thomas avers that whether a roach was in fact recovered from his car was "highly contested" at trial (Mot. at 12), but jury trials proceed precisely to resolve contested factual questions. The jury could rationally have concluded that Officers Botica and McAuliffe had probable cause to arrest Thomas for possession of marijuana at that time.

Thomas cites *Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 287–88 (1st Cir. 1993), to support his claim that a new trial is required on account of the surprise, but that case bears little resemblance to this one. (Mot. at 11 n.5.) In *Perez-Perez*, the district court had allowed the plaintiff to introduce the testimony of a previously undisclosed medical expert, who stated that one of the defendant-appellants' eyesight was "severely impaired by glaucoma." 993 F.3d at 286. Until that point in the case, the plaintiffs had pursued the theory that the defendant, a man named Betancourt, had struck a pedestrian with his leased car because Betancourt was driving with "utter disrespect toward human life" and "the accident was due only and exclusively to the negligence of defendants [sic] for not driving safely." *Id.* After the previously undisclosed

18

medical expert testified, however, plaintiff's counsel made Betancourt's eyesight such a "central issue" on cross-examination that the First Circuit concluded the plaintiffs had raised a "novel theory of liability" at the original trial and directed the grant of a new trial. *Id.* at 286–87.

In this case, Morales was anything but a surprise witness, and though Morales's trial testimony regarding a "grinder" or "cutter" may have contradicted his prior deposition testimony, Defendants did not turn the presence of such a tool into a "central issue" at trial. Further, it is beyond debate that whether Thomas's car had smelled of marijuana and whether Thomas in fact possessed marijuana at the time were already squarely in consideration in this case.

### C. Cross-Examination of Thomas

Thomas also argues that he was prejudiced by cross-examination on a previous, unrelated arrest by CPD, and another civil rights lawsuit filed by Thomas against CPD officers and the City. (Mot. at 10, 15.) These claims are examined in turn below.

### 1. Evidence of Subsequent Arrest

First, the reference to another arrest: the court instantly shut down the defense's line of questioning regarding Thomas's arrest record, and the topic did not come up again, either in defense counsel's cross-examination of Thomas or in the defense's closing argument. Thomas has not explained how or why he was nevertheless prejudiced; indeed, from reading Thomas's briefing on this issue, one would think that the court had allowed, rather than prevented, the cross-examination of Thomas regarding his prior arrests. (*See* Mot. at 12 (collecting cases standing for the proposition that a witness's arrest record is generally not admissible); Reply at 14–17 (arguing that Thomas did not "open the door" to cross-examination on this question and that the evidence was not otherwise admissible).) Rather than providing an explanation, Thomas merely offers the conclusory statement that "Defendants' sole reason for asking the Plaintiff in front of the jury whether this was the only time he was arrested was to ruin his trial, which they did." (Reply at 23.)

"Perfunctory and undeveloped arguments" such as this one are waived. *Hakim v.*

*Safariland, LLC*, 79 F.4th 861, 872 (7th Cir. 2023).  Thomas is not entitled to relief on this ground.

### 2.    Evidence of Other Lawsuit

Thomas has also presented the barest of arguments to support his claim that the court erred in allowing the defense to cross-examine Thomas regarding his other lawsuit and deposition testimony.  As Defendants point out, this line of argument in Thomas's motion spans just five lines of text (*see* Mot. at 15), and by way of support, Thomas has done no more than gesture at *Nelson v. City of Chicago*, 810 F.3d 1061, 1070–71 (7th Cir. 2016), as an example of a decision "granting new trial to plaintiff in part because prejudicial evidence of prior lawsuits should not have been admitted."  (Mot. at 15.)

Thomas failed to address this issue at all in his Reply brief, despite Defendants' five pages addressing the argument and offering rebuttal.  On that basis alone, the court could fairly consider the argument to be waived.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("failure to respond to an argument . . . results in waiver").  In any event, as explained below, if there was any error in admitting the challenged evidence, the error was harmless.

In *Nelson*, this court had allowed the defense to cross-examine the plaintiff, who had brought an unlawful search and seizure claim against Chicago police officers, about three *other* lawsuits he had filed against the Chicago police.  810 F.3d at 1070.  Nelson had received settlement payments in two of those cases.  *Id.*  The district court reasoned that "if the fact is he also had other episodes that generated complaints, the jury is entitled to consider that, because if he's fearful from other episodes, those are episodes that are not related to these defendants."  *Id.* at 1070–71.  Before the jury entered deliberations, the court issued the following limiting instruction:

> You have heard evidence that . . . Larry Nelson has filed lawsuits against the City of Chicago. A person is entitled to file a lawsuit. There is no evidence that any of his other claims were not valid. You may consider this evidence only in deciding whether Larry Nelson's testimony concerning his damages is truthful in whole, in part, or not at all.

*Id.* at 1071.  In denying Nelson's post-trial motion for mistrial, the district court also reasoned that

the fact of Nelson having filed other lawsuits against the police countered the idea that Nelson enjoyed a "cordial relationship" with the police. *Id.*

As the Seventh Circuit has observed, "as a general matter, a plaintiff's litigiousness may have some slight probative value, but that value is outweighed by the substantial danger of jury bias against the chronic litigant." *Mathis v. Phillips Chevrolet, Inc.*, 269 F.3d 771, 776 (7th Cir. 2001). The panel in *Nelson* found that the admission of evidence of plaintiff's other lawsuits was reversible error, as neither the impeachment nor damages rationales held up as grounds to admit the testimony. *Id.* at 1071–72. The Court of Appeals noted that nothing in Nelson's direct testimony at trial was contradicted by evidence that he had filed other suits against Chicago police officers; indeed, Nelson had "never claimed to have wholly placid relations with the Chicago Police Department." *Id.* Nor had defense counsel in *Nelson* shown any "interest in putting the facts of the prior lawsuits before the jury," and as such, the jury had "no way" to "meaningfully evaluate" the evidence from the other lawsuits vis-à-vis Nelson's claimed damages in the case at bar. *Id.*

Finally, in *Nelson*, the error in admitting the evidence was not harmless: although the district court's limiting instruction was relevant to the inquiry, the defense's comments in closing argument destroyed any presumption that the jury would consider the evidence only for a proper purpose. *Id.* Instead, in closing, defense counsel referenced Thomas's other lawsuits at least four times, asking "Why would he [Nelson] go through this litigation? . . . Because he's been paid before. That's why. And he's wanting it again." *Id.* at 1071. The defense also described Nelson as "working with the lawyer that sues the police," an aspersion the Seventh Circuit found "gratuitous" and "apparently meant to suggest [Nelson's] attorney and her client were in cahoots in a scheme to defraud the City." *Id.* at 1071, 1072.

This case differs in a number of ways. First, Defendants here drew out very specific evidence from the other lawsuit for allowable purposes. In his September 27, 2023 deposition testimony in *Franklin v. Zia*, Thomas stated that his depression and anxiety were attributable solely to the June 3, 2020 incident. That sworn statement, taken at face value, is relevant to and

probative of Thomas's claimed damages (or lack thereof) in this case. The statement also calls into question Thomas's credibility more broadly, because it contradicts Thomas's testimony in *this* case that as of February 22, 2024, he continued to suffer from anxiety and depression stemming from the November 19, 2019 incident.

Second, Defendants made reasonable efforts during their cross-examination of Thomas to avoid directly touching on the second lawsuit. Initially, defense counsel sought only to confirm that Thomas had had another encounter with the police on June 3, 2020, and then to ask Thomas about the testimony he had given regarding that incident. Counsel ultimately questioned Thomas about his *Franklin* lawsuit because Thomas could not or would not confirm whether Defendants here, Botica and McAuliffe, were also involved in the June 3, 2020 incident. Even then, the discussion was brief, spanning a bit more than a single page of the trial transcript.

Finally, any "litigiousness" on Thomas's part was not a major theme of the defense's case, or even a secondary theme. Defense counsel mentioned Thomas's other lawsuit exactly once in closing argument, and only with respect to the contradictory deposition testimony from that suit. The defense instead focused on the circumstances of *this* case, arguing that Officers Botica and McAuliffe had proper cause both to stop Thomas in the first place and later to arrest him, as well as reminding the jury that it was Thomas who bore the burden of proof in this case. (*See generally* Tr. at 735:13–749:19.) There was no effort to leave the jury with an impression of Thomas as a "chronic litigant," and certainly no insinuation that Thomas or his attorneys were engaged in a joint venture of filing meritless lawsuits.

In sum, even if Thomas did not waive this argument by failing to reply to Defendants' counterpoints, the court concludes it did not err in allowing defense counsel to question Thomas regarding the events underlying *Franklin v. Zia*, the filing of that lawsuit, and Thomas's deposition testimony in the case. Further, if the probative value of Thomas's statements regarding the source of his injuries (whether for damages or impeachment) was in fact outweighed by the risk of prejudice to Thomas of being seen as a chronic litigant, any error was harmless, as the defense

22

did not make Thomas's litigiousness a theme of its case.

### D. Jury Instructions

#### 1. Issues Instruction: Probable Cause

Thomas also takes issue with two of the instructions issued to the jury. The first of these is the "Issues" instruction, which reads as follows:

ISSUES INSTRUCTION

The Fourth Amendment prohibits unreasonable searches and seizures. Plaintiff claims two separate violations of his rights under the Fourth Amendment. First, Plaintiff claims Defendants violated his rights when they stopped the vehicle he was driving. Second, Plaintiff claims Defendants violated his rights when they arrested him.

Defendants claim they did not violate Plaintiff's rights under the Fourth Amendment because they had a reasonable suspicion that Plaintiff had committed a traffic violation and probable cause that Plaintiff had committed a crime.

(Jury Instructions [102] at 18.)

Thomas contends this instruction "did not inform the jury that the cause of action for false arrest they were to evaluate" was for the offense of "resisting," but instead "erroneously allowed the jury to evaluate the facts" in relation to probable cause "for *any* imaginable crime." (Mot. at 5, 6.) Thomas believes that the jury should have been limited to considering whether the officers had probable cause to arrest him for "resisting" because (a) failing to use a turn signal is a non-arrestable, civil offense, (b) the Defendant police officers "stated on the video that they arrested Plaintiff for the specific criminal offense of 'resisting,'" and (c) the officers did not find an alleged roach in the vehicle until after they had arrested Thomas for "resisting." (Mot. at 5.)

Thomas is mistaken about the law on this issue. "An arrest is reasonable under the Fourth Amendment so long as there is probable cause to believe that *some* criminal offense has been or is being committed, even if it is not the crime with which the officers initially charge the suspect." *Fox v. Hayes*, 600 F.3d 819, 837 (7th Cir. 2010) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153–56 (2004) (emphasis in original)). "That is to say, [the officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."

23

*Devenpeck*, 543 U.S. at 153. *See also* FED. CIV. JURY INSTRUCTIONS OF THE SEVENTH CIR. 7.08 (in false arrest cases, "it is not necessary that Defendant had probable cause to arrest Plaintiff for [*insert crime at issue*], so long as Defendant had probable cause to arrest him for some criminal offense.") The jury was entitled to consider whether probable cause existed to arrest Thomas for *any* offense, notwithstanding the fact that an officer announced that Thomas was under arrest for resisting.

Defendants cite both *Fox* and *Devenpeck* in their Opposition, arguing that Thomas's "espoused view on this issue was explicitly rejected by the United States Supreme Court." (*See* Opp. at 12–13.) Rather than discuss or even acknowledge adverse controlling precedent, in his Reply Thomas simply repeats that "the only probable cause analysis in this case was whether there was probable cause for and at the time of the Defendants' arrest of the Plaintiff for the crime of 'resisting.'" (Reply at 7.) Thomas points to *Beck v. Ohio*, 379 U.S. 89, 91 (1964) for support (*see id.* at 7), but that case does not state, or even suggest, that the probable cause inquiry should be narrowed in the way Thomas urges. What *Beck* says is that whether an arrest was constitutionally valid depends upon:

> whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing *an* offense.

379 U.S. at 91 (emphasis added).

Thomas's failure even to comment on the controlling precedent is disappointing and leaves Defendants' argument unrebutted. More importantly, Defendants' argument on this score is fully supported by controlling law. Thomas's argument to the contrary is overruled.

## 2. Authorized Acts and Underlying Crime Instructions

Thomas also objects to the jury instruction titled "Authorized Acts"; as explained below, however, his objection appears actually to be directed at a different jury instruction, titled "Underlying Crime — Obstructing / Resisting." The two instructions are reproduced below:

AUTHORIZED ACTS

If a police officer has reasonable articulable suspicion to conduct a traffic stop, the motorist must comply with the officer's commands.

If a police officer does not have reasonable articulable suspicion to conduct a traffic stop, the motorist does not need to comply with the officer's commands until the officer has probable cause to search the vehicle.

UNDERLYING CRIME — OBSTRUCTING / RESISTING

At the time of the incident, it was a violation of the law to resist or obstruct a peace officer in the performance of their duties. Specifically, a person commits obstruction or resistance of a peace officer when, (1) knowing that one is a peace officer, (2) he or she knowingly resists or obstructs (3) the officer's performance of an authorized act.

(Jury Instructions at 26–27.)  The Obstructing / Resisting instruction draws directly from 720 ILCS 5/31-1(a), which states that "a person who knowingly (1) resists arrest, or (2) obstructs the performance by one known to the person to be a peace officer, firefighter, or correctional institution employee of any authorized act within his or her official capacity commits a Class A misdemeanor."

Thomas does not call out any error within the Authorized Acts instruction itself.  Rather, Thomas complains of the fact that the court gave the Authorized Acts instruction to the jury "but refused any definition of resistance under the Illinois obstructing/resisting statute, 720 ILCS 5/31-1(a)," such that "the jury had no definition of resistance whereas substantive definitions of resistance did exist in Illinois law at the time of this jury trial."  (Mot. at 7–8.)  Consequently, Thomas claims, "the jury could have concluded that the Plaintiff's arguing with the Defendants, without more, constituted probable cause for the arrestable 'resisting' crime, thereby severely prejudicing Plaintiff's substantial rights."  (Mot. at 10.)

As above, Thomas also contends here that because Defendants only used the term "resisting" at the time of arrest, the jury's probable cause analysis should have been limited to the specific offense of "resisting," and not "obstructing."  (*See* Reply at 10–11 (positing that whether Thomas's conduct possibly qualified as "obstructing" is "not relevant" to the validity of the jury

25

instructions.) For this reason, Thomas makes hay of the fact that the court did not incorporate into the jury instructions a lengthy, recent discussion by the Appellate Court of Illinois regarding what kind of conduct qualifies as "resisting" under 720 ILCS 5/31-1(a). (*See* Mot. at 8–10 (citing *People v. Sadder-Bey,* 228 N.E.3d 253, 260–63, 2023 IL App (1st) 190027, ¶¶ 40–52 (2023).)

The court is not persuaded that the Obstructing / Resisting instruction misstated the law or confused the jury, and much less that Thomas was prejudiced. It is true that "resisting" and "obstructing" constitute two different offenses within the Illinois statute. *See People v. Shenault*, 25 N.E.3d 703, 709, 2014 IL App (2d) 130211, ¶ 17 (2014) ("resisting or resistance means withstanding the force or effect of or the exertion of oneself to counteract or defeat," whereas "obstruction," nearly synonymous with "interference," means "to be or come in the way of"); *see also Sadder-Bey*, 228 N.E.3d at 259, ¶ 29 (noting that the State had only charged the defendant "with resisting, not obstructing.") It is also true that "merely argu[ing] with" police officers "for a short time" does not make a defendant guilty of resisting. *Sadder-Bey*, 228 N.E.3d at 262–63, ¶ 51. But the instructions given to the jury did not say that mere argument constitutes resisting, and the Defendants did not suggest this in their closing argument.

Rather, the jury heard evidence that when Officers McAuliffe and Sanchez attempted to bring Thomas up out of the driver's seat (following Thomas's repeated refusals to exit the car of his own volition), Thomas "went limp," making his body a "dead weight," as McAuliffe described it. "Going limp" is an "act of opposition or counteraction" that the Appellate Court of Illinois in *Sadder-Bey*—Thomas's preferred case—specifically described as constituting "resistance." *Id.* at 261, ¶ 42. The jury could reasonably have concluded that the officers had probable cause to arrest Thomas for resisting.

Moreover, even if there *was* no probable cause to arrest for resisting, it remains the case that Thomas's arrest was justified if probable cause existed to believe Thomas was resisting *or* obstructing the performance of authorized acts *or* committing another crime— such as possession of marijuana. *See supra* at p. 23. There is no dispute here that, "at the time of the incident, it was

26

a violation of the law to knowingly possess cannabis." (Jury Instructions at 24.) Meanwhile, the bar for obstruction or interference is quite low: all that is required is that the defendant "interpose an obstacle that impedes or hinders the officer in the performance of his authorized duties." *Shenault*, 25 N.E.3d at 710, ¶ 20 (citing *People v. Baskerville*, 963 N.E.2d 898, 905, 2012 IL 111056, ¶ 23 (2012)). Indeed, "merely refusing a police officer's lawful order to move can constitute interference with the officer in the discharge of his or her duty." *Shenault*, 25 N.E.3d at 709, ¶ 17 (quoting *People v. Synnott*, 349 Ill. App. 3d 223, 227, 811 N.E. 2d 236, 340 (2d Dist. 2004).

The jury could easily have found that Officers Botica and McAuliffe had probable cause to arrest Thomas for either obstruction or possession of marijuana. It was clear from the evidence that Thomas had refused to roll down his window more than a few inches despite being asked many times to do so by McAuliffe, and no question that Thomas had also refused to exit his vehicle despite repeated instructions. The jury also heard evidence that Thomas had initially refused to put his gearshift in park during the stop, that Thomas's car smelled of marijuana, and that Officer Morales recovered a partially smoked marijuana cigarette (a "roach") from Thomas's car.

Having disposed of the merits of Thomas's Rule 59(a) motion, the court now moves to considering the alternative bases for relief raised by Thomas.

## II.     Court's Inherent Power to Impose Sanctions and Rule 60(b)(3) Motion

Regardless of whether the court properly admitted Morales's testimony that he saw a "grinder" in Thomas's car on the night of events, Thomas claims that he is entitled to judgment— or barring that, a new trial—because Morales's testimony on this topic was "knowingly false" and its introduction by defense counsel amounted to misconduct. (Mot. at 11.) But Thomas has not presented the clear and convincing evidence of fraud required for relief under Rule 60(b)(3), and for the same reason, the court declines to grant Thomas judgment or a new trial as a sanction for any claimed misconduct.

27

Thomas contends that by stipulating to the fact that the word "grinder" was not used in the body-worn camera footage nor in later depositions, Defendants have admitted that Morales lied under oath and fabricated evidence that a grinder was in the vehicle. (*Id.* at 12.) That is not the case. While the parties agreed that the term "grinder" had not previously been used, Morales testified at trial that he believed the terms "grinder" and "cutter" to be synonymous, and it appears beyond dispute that the presence of a "cutter" was at least mentioned at the time of arrest. In no way did Defendants concede that Morales had fabricated evidence. Without clear and direct evidence that Morales lied on the stand, Thomas is left to argue that Morales's testimony is "not believable" and "should not be credited," effectively rehashing his attacks on Morales's credibility from trial. (Reply at 18.)

The case law Thomas cites does not support his argument that Defendants committed fraud or misconduct. Thomas begins by citing *Fuery v. City of Chicago,* 900 F.3d 450, 452 (7th Cir. 2018), where the district court set aside a jury verdict for plaintiffs and entered judgment for the defendants based on the plaintiffs' "abuse of the judicial process." (Mot. at 12.) Thomas fails to include reference to a single detail about what happened in the *Fuery* case (Mot. at 12–13), and the court's own reading confirms that the misconduct there bears no resemblance to this case. [7]

Thomas continues by citing *Galvan v. Norberg,* 678 F.3d 581, 585 (7th Cir. 2012), as an instance where a judge of this court previously set aside a jury verdict and granted a new trial for

---

[7]     A sampling of the misconduct in *Fuery* follows. First, plaintiffs' counsel had repeatedly, and in the face of several warnings, asked questions designed to elicit testimony across at least four topics that had been barred by the court. *Fuery,* 900 F.3d at 455–57. The plaintiffs' testimony also repeatedly veered into topics that had been barred, leading the court to conclude that either plaintiffs' counsel had failed to properly prepare her clients for trial, or that the plaintiffs had intentionally violated the court's orders. *See id.* at 457–58. The district court further determined that plaintiff's counsel, at minimum, had given dishonest answers to the court about her conversations with a *Chicago Tribune* reporter during trial, and that she had most likely improperly passed material to that reporter, either directly or through an accomplice. *See id.* at 460–61. Finally, the court determined that one of the plaintiffs (likely with the cooperation of counsel) had engaged in spoliation of evidence earlier in the case. *See id.* at 461–463.

the plaintiff based on the judge's belief that one of the prevailing defendant police officers had offered testimony that was "patently false and indeed perjurious." (Mot. at 13.) The defendants filed a motion to reconsider the grant of new trial, and the case was reassigned to another judge, who solicited supplemental briefing from the parties—at least in part because defendants had not had the opportunity to respond to the plaintiff's motion for new trial. *See Galvan*, 678 F.3d at 584–586; *Galvan v. Norberg*, No. 04 C 4003, 2011 WL 1898237, at *5 (N.D. Ill. May 18, 2011). After briefing, the district court reinstated the jury's verdict, concluding that the earlier ruling was based on the first trial judge's "common-sense notion" that the testimony at issue "was too good to be true," rather than on "actual evidence, let alone a *manifest* weight of evidence, that required the jury to reject the testimony." *Galvan*, 678 F.3d at 586. The Seventh Circuit affirmed, effectively confirming that the court's (or opposing counsel's) suspicions about testimony are *not* a basis for a new trial. *Id.* at 582.

Regardless of the proper name for the tool, Plaintiff is suspicious about the notion that Morales (or any other officer) saw in Thomas's car a device used for breaking down marijuana so that it can be rolled into a joint. Thomas's counsel emphasized this to the jury, arguing at closings that Morales's testimony was too good to be true and should be rejected. But Plaintiff has not shown that no reasonable jury would have accepted Morales's testimony. More importantly, even if the jury concluded that Morales was a liar whose testimony could not be credited and that the officers never had probable cause to arrest Thomas for possession of marijuana, the jury could still easily have concluded that Botica and McAuliffe were justified in stopping Thomas for failing to use a turn signal, and later in arresting him for either obstruction or resistance.

Thomas's final case on this topic, *Fields v. City of Chicago*, 981 F.3d 534 (7th Cir. 2020), serves him no better. In *Fields*, defense counsel had repeatedly asserted at trial that a key witness had not received any consideration for his trial testimony. *See id*. at 555–56. But that witness, incarcerated at the time of trial and not scheduled to be released for another 13 years, was granted parole and released from prison less than three months after giving his testimony.

*Id.* at 552–54, 558. The district court reasoned that the newly discovered evidence was not merely impeaching of the witness but demonstrated misrepresentation and fraud in the case on the part of the defense; the Seventh Circuit affirmed. *Id.* at 555.

Unlike the plaintiff in *Fields*, Thomas has not brought to this court's attention any evidence that emerged after trial and makes clear that Officer Morales and defense counsel engaged in misrepresentation and fraud during proceedings. Thomas is not entitled to relief under Rule 60(b)(3).

## **CONCLUSION**

For the reasons explained above, Thomas's motion for a new trial or to set aside the judgment in the alternative is denied.

ENTER:

Dated: February 6, 2025

_____
REBECCA R. PALLMEYER
United States District Judge